(No. 27409.—■■■■■■)
CHARLES S. WECHTER *et al.,* Appellants, *vs.* CHICAGO TITLE AND TRUST COMPANY, Trustee, *et al.,* Appellees.

*Opinion filed Nov. 16, 1943—Rehearing denied Jan. 13, 1944.*

SHULMAN, SHULMAN & ABRAMS, (MEYER ABRAMS, of counsel,) all of Chicago, for appellants.

CONCANNON, DILLON, SNOOK & ARTHUR, SALTIEL & PILKINGTON, and SONNENSCHEIN, BERKSON, LAUTMANN, LEVINSON & MORSE, (DAVID LEVINSON, WILLIAM H. DILLON, and BEN ROTHBAUM, of counsel,) all of Chicago, for appellees.

Mr. JUSTICE FULTON delivered the opinion of the court:

This cause arises upon a complaint in equity for partition' and other relief filed in the superior court of Cook county by the plaintiffs, who are beneficiaries of a trust created November 15, 1927, terminable upon the expiration of a 99-year lease dated the same date.

No evidence was presented in the trial court, the plaintiffs having elected to stand upon those allegations of the amended complaint specifically admitted by the defendants and upon the affirmative allegations set forth in the answers taken as admitted by the plaintiffs.

From the amended complaint, answers thereto and exhibits attached, the following pertinent facts are shown: On November 15, 1927, Daniel E. Sawyer, the owner of the fee-simple title to certain real estate located at the southwest corner of North Michigan avenue and East Chestnut street, Chicago, Illinois, executed a lease demising said property to the Michigan-Chestnut Building Corporation, an Illinois corporation, for a term of 99 years, commencing November 15, 1927, and ending November 14, 2026, at a yearly rental of $70,125, plus the payment of taxes and an annual payment of $3000 to the Chicago Title and Trust Company, which was to become trustee and lessor. The lease provided that the lessee was to establish and maintain a $1,000,000 depreciation fund in quarter-annual installments which was to provide for the retirement of land trust certificates and for depreciation; that the lessee was to demolish the building then on the premises and construct a six-story modern building to have a fair value of not less than $850,000 with the proceeds

of a leasehold bond issue of $575,000, which was done, and a new building was erected at a cost in excess of $1,000,000. Upon the completion of the building it became additional security for the performance of the terms of the lease. The lease further provided that the lessor was to have a first, superior and paramount lien upon the leasehold estate.

Immediately following the execution of the lease, Sawyer conveyed the fee-simple title to the property to the Chicago Title and Trust Company, as trustee, subject to said lease, and simultaneously executed an agreement and declaration of trust wherein the Chicago Title and Trust Company, as first part, became trustee. The equitable ownership and beneficial interest in the trust estate was divided into 1275 indivisible equal shares each representing one 1275th part of the equitable ownership of the trust estate. The shares were represented by certificates of equitable ownership, also known as land trust certificates transferable upon the books of the trustee. The trust was to continue for the leasehold term unless sooner terminated. It provided, among other things, that the trustee would pay to the beneficiaries on the 15th day of May and November of each year the net proceeds which may be derived from the rental of the property and that the certificates of interest could be conveyed and transferred in full shares of one 1275th each, but not in fractions thereof. Upon the expiration of the 99-year period, it was subject to a renewal of the lease for a like term.

Article V of the trust instrument provided that the ordinary duties of the trustee were restricted to the collection of rent and the distribution of the net rentals. In the event of a default by the lessee, the trustee "shall have full authority to terminate the Lease and to sell the Trust Estate and terminate the Trust, and in such case or in any other contingency either with or without terminating

the Lease to take such other action with respect to the Lessee, the Lease or the Trust Estate as it shall deem advisable, without reference to the Beneficiaries and as if it were the sole legal and equitable owner thereof, * * *."

Article VI provided that no beneficiary was to have any legal title to the trust property itself or any part thereof held by the trustee, his interest being in the equitable estate only and "he shall have no right to call for any partition of the Trust Estate during the continuance of the Trust * * *."

Article VII prohibited any assessment upon the beneficiaries and prohibited the trustee from incurring any obligation rendering the beneficiaries personally liable.

Article IX gave the trustee power to exercise all of the rights, remedies, powers and privileges of the lessor, including the right to renew for an additional term of 99 years, and relinquished any liability on the part of the trustee for any error of judgment or for any loss arising out of any act or omission in the execution of the trust so long as the acts were in good faith; the trustee was to have power to provide funds to meet a temporary exigency or to enable it to comply with any of the provisions of the lease, to make advances at reasonable or customary rates of interest or to borrow money and give notes, or other security, therefor, binding the income and assets of the trust, but not the trustee or beneficiary personally; that such right of control as the trustee may deem for the best interest of the beneficiaries was to be free from all control by the beneficiaries as fully as if the trustee were the sole legal and equitable owner.

Article X provided that the trustee, for ordinary services rendered, was to be paid the annual rate of $3000, said sum being the additional rental payable by the lessee under the terms of the lease; for extraordinary services the trustee was to receive additional compensation.

Article XIV provided that the trust agreement could be amended from time to time or the trust terminated by consent in writing by the owners of three fourths of the outstanding shares other than shares in the depreciation fund, except that no amendment could be made to deprive or take from the trustee the control and/or discretion conferred upon it under the agreement or confer upon the owners of outstanding shares or any of them any control over, or voice in, the administration of the trust. The trust was to terminate at the end of the leasehold estate or upon the purchase of the property by the lessee. In case of termination other than by purchase, distribution was to be made to the beneficiaries in kind by conveyance of the trust estate in undivided legal interests, or, at the election of the trustee, by a sale and distribution of the proceeds. The trustee was to have full power and authority at any time to sell the trust estate and to execute proper conveyances therefor, provided that the owners of three fourths of the outstanding shares other than the shares in the depreciation fund should consent in writing to such sale.

As the period of depression approached, it was impossible to keep the building fully occupied and the lessee became badly in default on the payment of rent. The lessee also defaulted in the payment of 1929 and 1930 taxes, totaling in excess of $63,000. The trustee served notice upon the lessee to make good the default within thirty days. The defaults were not cured and on February 14, 1933, the lessee accepted the proposal of the trustee to turn over to the trustee the net rentals.

In connection with the original financing of the new building erected upon the premises, the Michigan-Chestnut Building Corporation executed a leasehold bond issue in the sum of $575,000 secured by a trust deed conveying the leasehold estate. Being in default the leasehold bond issue was foreclosed subject to the rights of the holders of land

trust certificates. A receiver appointed on June 29, 1934, continued to pay the net rentals to the trustee. Reorganization proceedings were instituted under section 77B of the U. S. Bankruptcy Act by the corporation, which proceedings were terminated December 23, 1936, upon motion of the trustee. Upon the dismissal of the reorganization proceedings the circuit court of Cook county again took over the foreclosure proceedings and the Michigan-Chestnut Building Corporation was allowed to remain in possession while continuing to turn over all net income to the trustee. The trustee continued to receive the net income until March 4, 1939, when, after consulting with 99 certificate holders evidencing 541 shares of equitable ownership, it instituted proceedings to foreclose its landlord's lien on the leasehold estate. Prior thereto the trustee had sent a communication to the land trust certificate holders advising that the trustee intended to proceed to bring about a termination of the leasehold estate unless a substantial number of the certificate holders objected thereto. A committee empowered to act for the 99 certificate holders thereafter urged the trustee to foreclose in lieu of forfeiting the leasehold estate for the reason that under the existing income-tax laws the beneficial owners might be assessed an income tax on their proportion of the building, which would be a hardship upon all and disastrous to many of the certificate holders. The trustee thereafter foreclosed in the circuit court of Cook county. On May 6, 1939, the trustee notified the certificate holders of the proceedings and of the expenditure of $127,000 for necessary repairs and improvements required in connection with the rental of the building and further that the trustee had placed a first mortgage in the amount of $150,000 upon the real estate. This communication likewise informed the certificate holders that for ordinary services from December 15, 1935, to February 15, 1939,

$9750 had been received by the trustee and for extraordinary services the trustee had received $4425.90 for the period from March 26, 1936, to March 31, 1939. It had also received a fee of $530.95 for paying taxes for the years 1933 to 1937.

On January 8, 1940, a decree of foreclosure was entered and at a sale held on March 15, 1940, the property was bid in for $15,000 by the Chestnut-Michigan Company, an Illinois corporation, which received a deed at the termination of the period of redemption.

For the purpose of purchasing the property at the foreclosure sale the trustee organized the Chestnut-Michigan Company as a corporation with a capital of $15,000. The capital was furnished from the trust estate and the newly formed company was wholly controlled by the Chicago Title and Trust Company, as trustee for the use and benefit of its beneficiaries. On May 31, 1940, the trustee addressed a communication to the beneficiaries wherein it stated that it had created the new company as a legal entity for the purpose of purchasing the leasehold estate for the benefit of the trust, the trustee still being the owner of the fee.

It is the theory of the appellants that because of the defaults of the original lessee and the foreclosure of the leasehold estate the 99-year lease was extinguished, and the creation of the new entity did not supply the required lessee under the terms of the original lease; that, due to the fact that the trustee owned the fee and also the new entity for the benefit of the certificate holders, the lesser estate merged in the larger estate, and there was no lessee in existence, which fact operated as a termination of the trust. It is their further contention that the entire object of the trust failed; that it therefore should have been terminated, its property sold and assets distributed. Also that the trustee had no right to charge the

trust estate with the $3000 annual payment after default by the lessee; that the trustee had no right to encumber the property with the $150,000 mortgage; that the entire trust was illegal and void as a restraint on alienations for 198 years, and that the restraint on the right to partition was void and against public policy.

The chancellor in the superior court of Cook county construed the words "expiration of lease" to mean the termination of the original leasehold term. He held that the trustee had acted in good faith, properly managed the affairs of the trust and properly charged the fees to the trust estate; that under powers given it in the trust agreement the trustee had full discretion to take such action with respect to the lessee, the lease or the trust estate as to it was deemed advisable and as if it were the sole legal and equitable owner of the property; that nevertheless the trustee had consulted with the certificate holders with respect to each and every step taken by it and every policy adopted by it in the administration of the trust estate; that all fees were reasonable; that the trust did not violate the rule against perpetuities; that the beneficial holders under the terms of the trust had no right to partition; that the $150,000 mortgage was authorized by the trust agreement; and that there was no merger or intention of merger of the interest of the new entity with the fee title.

Because a freehold is involved, the appeal is brought direct from the superior court of Cook county.

In appellants first contention they claim that the chancellor erred in construing the words "expiration of lease" to mean the year 2026. It is contended that these words mean that upon a default and the election of the lessor the lease shall cease and expire with like effect as if the year 2026 had arrived. Appellants further contend that the words "expiration of lease" are synonymous with the

words "termination of lease" and related to the absence of a lessee, whether by efflux of the term or by operation of law.

Appellants then point out that Sawyer, the creator of the trust, was only interested in obtaining $1,275,000 for his fee title and that it was necessary, in order to sell the land trust certificates, that an attractive plan be set forth for the investors, which included as part of its attractiveness the annual rental of $70,125; that thereby the land trust certificate holders were assured that they would receive the dividends from the income and that their certificates would be retired from the depreciation fund; that the intent of the plan was that the trust exist as long as there was a lessee paying the net rental for these purposes.

Article XIV of the trust agreement provided: "Unless sooner terminated this Trust shall be terminated upon the expiration of the Lease * * *. The Trustee shall have full power and authority at any time to sell the Trust Estate * * * provided that the owner or owners of three-fourth (¾) of the outstanding shares issued hereunder * * * shall consent in writing to such sale."

Nowhere in the lease is there any provision for an automatic termination in case of a default by the lessee. The trustee, by the trust instrument, is given the fullest and broadest powers and discretion with reference to terminating or continuing the lease in effect. Article V of the trust agreement provides as follows: "In the event that the Lessee shall make default in any of the provisions of the Lease, so that it shall become necessary, or in the opinion of the Trustee advisable, for the Trustee to terminate the same, then the Trustee shall have full authority to terminate the Lease and to sell the Trust Estate and terminate the Trust, and in such case or in any other contingency either with or without terminating the lease to take such action with respect to the Lessee, the Lease or the Trust Estate as it shall deem advisable, without reference

to the Beneficiaries and as if it were the sole legal and equitable owner thereof, * * *." It necessarily follows from the language above quoted that, unless the trustee elected to terminate the lease, there was no termination and no lapse or expiration of the term.

In the instant case the right to foreclose its landlord's lien, the powers exercised by the trustee as the lessor, the financing and the complete control and management of the enterprise were given the trustee and indicated an intention that the trust should operate over a long period of time. The language used in the provisions of said instrument is sufficiently broad to authorize such action on the part of the trustee as will insure the life of the lease. The language of the lease clearly left the power to terminate the lease to the discretion of the trustee, and only at his election could the termination be accomplished because of defaults on the part of the lessee. It is apparent that every effort on the part of the trustee was directed toward keeping the lease alive, and we do not feel that the facts warrant the conclusion that the lease was terminated by operation of law.

It is next asserted by the plaintiffs that the leasehold, being the lesser estate, was merged with the fee title, being the larger estate, and it therefore became the duty of the court to order a termination of the trust. They point to the fact that the Chestnut-Michigan Company was created for the purpose of bidding at the foreclosure sale of the leasehold estate; that the trustee used the funds of the trust estate to pay for the capital stock of such company and wholly owned and controlled the corporation for the use and benefit of the land trust certificate holders; that in consequence of such action the ownership of the lease and the fee was lodged in the trustee and by operation of law created a merger.

In *Forthman* v. *Deters,* 206 Ill. 159, at page 171, we said: "It is well settled that, at law, when a greater or

lesser, or a legal and equitable estate, coincide in the same person, the lesser, or the equitable estate, is immediately merged and annihilated. (15 Am. & Eng. Ency. of Law, (1st ed.) p. 314.) It is true that the question, whether or not a merger takes place in equity, depends upon the intention of the parties, and a variety of other circumstances." Thus, whether or not a merger took effect depends upon the facts and the intention of the parties, together with an application of law. It is admitted that the purpose of the lease was to provide a yearly rental of $70,125 and an annual payment of $3000 for the ordinary duties of the trustee and to further maintain a depreciation fund out of which to retire the land trust certificates. Appellants contend that this was impossible under the setup provided by the merger since there was no landlord or tenant relationship, both being one and the same.

In the case of *Clark* v. *Glos,* 180 Ill. 556, at page 565, it was stated: " 'Mergers are not * * * favored either in courts of law or in equity' * * *. It has been said that, in order to effect a merger there must be at least two estates in the same property, which have vested in the same person. * * * It is also a well settled rule, that, in equity, it depends upon the intention of the parties and a variety of other circumstances, whether or not a merger takes place. Equity will prevent or permit a merger, as will best subserve the purposes of justice, and the actual and just intention of the parties."

The chancellor held that from the facts presented upon the pleadings no merger had taken place. With this we are disposed to agree. The Chestnut-Michigan Company was a distinct and separate entity from the trustee, the former owning the lease and the latter holding the fee title. The procedure used by these several parties herein and the express desire to avoid the infliction of an income tax under the law as it then existed indicated a clear cut desire on the part of all parties concerned that there be no merger

of the larger with the lesser estate. There was nothing fraudulent in the avoidance of the levy of an income tax upon the beneficiaries, (*United States* v. *Isham*, 84 U. S. 728, 731,) and the beneficiaries were fully advised of every action taken by the trustee.

In *Chicago Title and Trust Co.* v. *Chief Wash Co.* 368 Ill. 146, it was said: "If a Trusee is vested with the power to exercise discretion, as in the present case, chancery will not interfere so long as he is acting *bona fide,* and not in an wholly unreasonable and arbitrary manner." The appellants have not pleaded fraud in the action of the trustee in setting up a separate corporate entity.

In *Dowling* v. *Springer*, 100 Pac. (2d) 278, 279, the court said: "The equitable doctrine of merger of estates is that where the legal estate, for example the fee, and an equal or lesser equitable estate in the same property, for example a mortgage, are acquired by the same person, the equitable estate merges with the legal, in the absence of an intention that they shall not merge. But if it appears, from the circumstances surrounding the acquisition of the two estates, such as the taking of title to one of them in the name of a Trustee, or by language inserted in the instrument of transfer, that the intention of the party acquiring is that such estate shall not merge, or if it appears that such party will be benefited by keeping both estates alive, no merger will result. Pomeroy's Equity Jurisprudence (4th ed.) sec. 788 *et seq;* Jones on Mortgages, (8th ed.), sec. 1080; 10 R. C. L. 666; 21 C. J. 1033." Section 4 of article XXVI of the lease provides, "any person * * * on acquiring the rights and interest of the Lessee under the terms and provisions of this Lease, either by judicial sale thereof, * * * or as the result of any legal process or proceedings whatsoever, shall thereby be and become liable to the Lessor for the performance of each and all the terms, provisions and conditions of this Lease, as fully and completely as is herein provided for

an assignee of said Lease." Under the terms of this section the new legal entity acquired the rights and interests of the lessee and is liable to the lessor for the performance of the original lease. We believe that the court below committed no error in holding that there was no merger and it necessarily follows that the leasehold estate is still in existence.

Appellants' third point is that the entire purpose and object of the trust failed with the extinguishment of the *bona fide* lessee for the reason that the trust was to exist only as long as there was a lessee paying rent. Appellants further allege that the only purpose of keeping the trust alive is to allow the trustee his annual $3000 fee for ordinary services with additional fees for extraordinary services. The language of the trust in article V allowing the trustee the discretion of either terminating the lease or of taking such other action relative to the lease as to it seems advisable and the further provision of article IX giving the trustee full power to exercise all the rights, remedies, powers and privileges of the lessor and the further authority to waive defaults on the part of the trustee seems to contradict appellants' theory and would indicate authority to keep the trust alive even though the lease might have failed. The provision that the trust can be dissolved and terminated at any time upon the action of three fourths of the certificate holders was no doubt inserted to prevent the destruction of the trust on the part of a small minority of the certificate holders. In this case the plaintiffs represent an aggregate of 35 shares of equitable ownership out of a total of 1275. All of the other owners were made parties defendant and a substantial number have appeared in opposition to the complaint.

Appellants' fourth point is that the trustee should refund to the trust the annual fee of $3000 which it charged to the trust since the default of the lessee and to further reimburse the estate for the damage caused by placing a

$150,000 mortgage against the property. Appellants point to article X of the trust agreement where it was provided that the compensation of the trustee shall be at the rate of $3000 per year, said compensation being additional rental payable by the lessee and the further provision therein that in the event it shall become necessary for the trustee at any time to render extraordinary services, such compensation shall be a lien against and paid from the trust estate. The chancellor found that all fees charged by the trustee were reasonable for the services rendered, and the facts shown in the pleadings and the exhibits would indicate that the sum paid is not exorbitant for the services rendered. As to the claim of illegally placing a $150,000 mortgage against the property, it must be remembered that the trustee was imbued with all of the powers of the lessor which also includes borrowing money and the placing of a mortgage upon the property. The trust agreement itself in article IX gave the power for temporary exigencies to borrow money and provide funds for the trust estate. The language of the entire trust agreement as a whole would indicate that if proper repairs for the rental of the premises were necessary and a lessee was unable so to provide the repairs, or the repairs came at a transition period between lessees, the trustee should be authorized to make a sufficient loan or expenditure to provide the necessary repairs for the rental purposes of the trust.

The next claim of the appellants is that the limitation on the power of sale prior to the expiration of the 99-year term conditioned upon joint action of the trustee and three fourths of the equitable interests operated as a restraint on alienation and that the provision which bars partition until the expiration of the 99-year term is against public policy.

In *McKibben* v. *Pioneer Trust & Savings Bank*, 365 Ill. 369, at 373, in defining the rule against perpetuities it

was said: "As commonly stated, it is as follows: 'No interest is good unless it must vest, if at all, not later than twenty-one years after some life in being at the creation of the interest.' (Gray, Rule Against Perpetuities, 1915, chap. 6, p. 174.)" The case further pointed out that the rule applied, by its express terms, only to contingent future interests and not to interests that are vested and applies further only to the beginning of the interest and is not involved in the postponement of its enjoyment. Much the same language is used in the case of *Armstrong* v. *Barber,* 239 Ill. 389.

In the instant case the legal fee title was vested in the trustee upon the creation of the trust estate and immediately thereupon the entire legal fee-simple estate vested in the trustee. Under the terms of the agreement the beneficiaries have undivided equitable estates in the property which likewise are vested and are not contingent or otherwise. They vest immediately upon their acquisition by the certificate holders. Thus both the legal and equitable estates being vested, the rule against perpetuities has no application to this trust in accordance with the chancellor's ruling. Appellants, however, point out that even though there is a vesting of the estates there is a violation of restraint on alienations and cite Kales's Estates and Future Interests (1920 ed.) where, at page 755, it is said: "When however, as in the usual real estate or stock trust, the trusteeship is to last indefinitely or for the life of a corporation which is longer than twenty-one years, and the beneficial interests are always absolute and indefeasible and the trust cannot be terminated earlier by any individual beneficiary, but only by a vote of a proportion of them, it is necessary that the trust should be limited to lives in being at the creation of the trust and twenty-one years after the death of the last survivor in order to insure, for that period at least, the indestructibility of the trust. The omission of this precaution exposes the continuance of the

trust to assault by a single beneficiary." Kales points out that *Howe* v. *Morse,* 174 Mass. 491, 55 N. E. 213, is contrary to this holding, but the distinction is that it is a Massachusetts or Boston real estate trust.

In *Armstrong* v. *Barber,* 239 Ill. 389, it was pointed out that there must be some limit as to the length of time a trust may last and quotes Gray on Perpetuities that perhaps the same period prescribed by the rule of perpetuities should be taken to construe restraints on alienations. The appellees point out that the *Armstrong case* said that in Illinois indestructible trusts have been permitted.

The case of *Schumann-Heink* v. *Folsom,* 328 Ill. 321, discusses the Massachusetts trust as the ordinary business trust or common-law trust used in Illinois and holds that business trusts, as such, are not against public policy.

The case of *Howe* v. *Morse,* 174 Mass. 491, was a trust in which some of the features of the instant case are involved. There it was said that there was no restraint upon alienation and the provision that the shareholders are not to have any interest or title in the trust property itself and no right to call for partition is not a restraint upon alienation since the alienation of the legal and the equitable ownerships is provided for; that the whole interest of the equitable owners comes through the shares which are vendable without restraint; that the entire ownership of the shares is never for a moment uncertain nor unvested and every moment each owner can freely dispose of his own property.

The case of *Baker* v. *Stearn,* 194 Wis. 233, 216 N. W. 147, also involves many of the features of the instant case and justifies a holding that since a trust agreement contains no prohibition against terminating the trust and all parties interested being *in esse* where they can by uniting cause a termination of the trust, the mere fact that the trust is perpetual or, as in the instant case, for 99 years does not affect it; that a term is not objectionable so long

as it does not offend the right of alienation. See Gray on Perpetuities, (4th ed.) sec. 509.

In the instant case the trust could be terminated at any time by action of the trustee and three fourths of the shareholders. The certificates could be transferred by the shareholders at will. With this situation we do not believe that the rule against restraints upon alienation has been violated. The decree of the chancellor should be and is affirmed.